# Appendix

AGREEMENT AND PLAN OF MERGER

by and among

NEXTERA ENERGY, INC.

NEE ACQUISITION SUB I, LLC,

NEE ACQUISITION SUB II, INC.

and

HAWAIIAN ELECTRIC INDUSTRIES, INC.

Dated as of December 3, 2014

This AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of December 3, 2014, is by and among NextEra Energy, Inc., a Florida corporation ("Parent"), NEE Acquisition Sub I, LLC, a Delaware limited liability company ("Merger Sub II"), NEE Acquisition Sub II, Inc., a Delaware corporation ("Merger Sub I"), and Hawaiian Electric Industries, Inc., a Hawaii corporation (the "Company").

WHEREAS, the parties hereto intend that, upon the terms and subject to the conditions set forth in this Agreement, (a) at the Effective Time, Merger Sub I will merge with and into the Company, with the Company surviving the merger (the "Initial Merger") as the surviving corporation (the "Surviving Corporation") and (b) immediately after the Effective Time and without further approval, authorization or direction from or by any of the parties hereto, as part of an integrated plan with the Initial Merger, the Surviving Corporation will merge with and into Merger Sub II (the "Subsequent Merger" and, together with the Initial Merger, the "Integrated Mergers"), with Merger Sub II surviving the Subsequent Merger as the surviving company (the "Surviving Company");

WHEREAS, it is a condition to the Integrated Mergers that the Company, prior to the Effective Time, distribute to the Company's shareholders all of the issued and outstanding shares of common stock of ASB Hawaii, Inc., a Hawaii corporation ("ASB Hawaii") and a wholly owned subsidiary of the Company and a direct parent company of American Savings Bank, F.S.B., a federal savings bank ("ASB") (such distribution referred to as the "Distribution" or the "Bank Spin-Off" and, together with the related transactions, actions, agreements and undertakings in connection therewith, the "Bank Spin-Off Agreements"), such that at the Effective Time, the Company is no longer a savings and loan holding company;

WHEREAS, the board of directors of the Company (the "Company Board") has (a) determined that it is in the best interests of the Company and its shareholders, and declared it advisable, to enter into this Agreement, (b) adopted and approved the execution, delivery and performance of this Agreement and the consummation of the Integrated Mergers and (c) resolved to recommend approval of this Agreement by the Company's shareholders;

WHEREAS, the board of directors of Parent (the "Parent Board") has authorized and approved the execution, delivery and performance of this Agreement and the consummation of the Integrated Mergers;

WHEREAS, Parent, as sole shareholder of Merger Sub I, has authorized and approved the execution, delivery and performance of this Agreement and the consummation of the Initial Merger by Merger Sub I;

WHEREAS, Parent, as sole manager of Merger Sub II, has authorized and approved the execution, delivery and performance of this Agreement and the consummation of the Subsequent Merger by Merger Sub II;

WHEREAS, for U.S. federal income tax purposes the Integrated Mergers are intended to be treated as a single integrated transaction that will qualify for the Intended Tax Treatment; and

**Appendix Page 3**

WHEREAS, Parent, Merger Sub I, Merger Sub II and the Company desire to make certain representations, warranties, covenants and agreements specified herein in connection with this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth herein, and subject to the conditions set forth herein, and intending to be legally bound hereby, Parent, Merger Sub I, Merger Sub II and the Company agree as follows:

ARTICLE I

The Distribution and the Integrated Mergers

SECTION 1.01     The Distribution.

(a)     Upon the terms and subject to the conditions of the Bank Spin-Off Agreements, on the Closing Date but prior to the Effective Time and subject to the satisfaction or (to the extent permitted by Law) waiver of the conditions set forth in Article VII and the confirmation of Parent and Merger Sub I that each of them is ready, willing and able to consummate the Initial Merger promptly after the consummation of the Distribution, the Company shall cause to be effected the Distribution and the other transactions contemplated by the Bank Spin-Off Agreements, in each case in accordance with the terms of the Bank Spin-Off Agreements.

(b)     Each of the Company and Parent shall cooperate reasonably with each other, and shall cause their respective Affiliates to cooperate, such that the Distribution shall be effected on the Closing Date, prior to the Effective Time, with as short as possible of a delay between the consummation of the Distribution and the Effective Time.

SECTION 1.02     The Initial Merger and the Subsequent Merger.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the requirements set forth in Section 414 of the Hawaii Business Corporation Act (the "HBCA") and the applicable provisions of the Delaware General Corporation Law (the "DGCL"), at the Effective Time, Merger Sub I shall be merged with and into the Company, and the separate corporate existence of Merger Sub I shall cease.  The Company shall continue as the Surviving Corporation and as a wholly owned Parent Subsidiary.  Immediately after the Effective Time, upon the terms set forth in this Agreement, and in accordance with the requirements set forth in Section 414 of the HBCA and the applicable provisions of the Delaware Limited Liability Company Act (the "DLLCA"), the Surviving Corporation shall merge with and into Merger Sub II, and the separate corporate existence of the Surviving Corporation shall cease.  At the effective time of the Subsequent Merger, the effects of the Integrated Mergers shall be as provided in this Agreement, the Initial Articles of Merger, the Subsequent Certificate of Merger and the applicable provisions of the HBCA and the DLLCA.  Without limiting the generality of the foregoing, and subject thereto, (i) at the Effective Time, all of the property, rights, privileges, powers and franchises of the Company and Merger Sub I shall vest in the Surviving Corporation, and all debts, liabilities and duties of the Company and Merger Sub I shall become the debts, liabilities and duties of the Surviving Corporation and (ii) at the effective time of the Subsequent

2

transactions (the "Net Parent Position") not been within the risk parameters in all material respects that are set forth in the Parent Trading Policies except for such Net Parent Positions that have been subsequently corrected in accordance with the Parent Trading Policies.

SECTION 4.18  No Additional Representations. Each of Parent, Merger Sub I and Merger Sub II acknowledge that (a) none of the Company, the Company Subsidiaries or any Person on behalf of the Company makes any other express or implied representation or warranty as to any matter whatsoever except as expressly set forth in this Agreement, (b) it has relied solely on the representations and warranties of the Company contained in this Agreement and (c) it has not been induced to enter into this Agreement by any representation, warranty or other statement of or by the Company, any Subsidiary or any other Person on behalf of the Company, and specifically (but without limiting the generality of the foregoing), each of Parent, Merger Sub I and Merger Sub II acknowledge that none of the Company, the Company Subsidiaries or any Person on behalf of the Company makes any express or implied representation or warranty with respect to (x) any projections, estimates or budgets delivered or made available to Parent, Merger Sub I or Merger Sub II (or any of their respective Affiliates, officers, directors, employees or Representatives) of future revenues, results of operations (or any component thereof), cash flows or financial condition (or any component thereof) of the Company and the Company Subsidiaries or (y) the future business and operations of the Company and the Company Subsidiaries.

ARTICLE V

Covenants Relating to Conduct of Business

SECTION 5.01  Conduct of Business.

(a) Conduct of Business by the Company. Except for matters set forth in the Company Disclosure Letter or otherwise expressly permitted or required by this Agreement, or as required by the HPUC Proceedings (the conduct of which shall be governed by Section 5.02), or with the prior written consent of Parent, from the date of this Agreement to the Effective Time, the Company shall use reasonable best efforts to, and to cause each Company Subsidiary to, (x) conduct its business in the ordinary course consistent with past practice, in each case in all material respects and (y) preserve intact its business organization and relationships with employees, customers, suppliers and Governmental Entities. In addition, and without limiting the generality of the foregoing, except for matters set forth in the Company Disclosure Letter or otherwise expressly permitted or required by this Agreement, or as required by a Governmental Entity (including pursuant to an order issued by the HPUC) or by applicable Law, or as required by the HPUC Proceedings (the conduct of which shall be governed by Section 5.02), or with the prior written consent of Parent (which consent shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement to the Effective Time, the Company shall not, and shall not permit any Company Subsidiary to, do any of the following:

(i) declare, set aside or pay any dividends on, or make any other distributions (whether in cash, stock or property or any combination thereof) in respect of, any of its capital stock, other equity interests or voting

38

securities, other than (A) subject to Section 6.14, regular quarterly cash dividends payable by the Company in respect of shares of Company Common Stock, with declaration, record and payment dates in accordance with the Company's past practice and not to exceed $0.31 per share per quarter, (B) dividends and distributions by a direct or indirect Company Subsidiary to its parent with declaration, record and payment dates in accordance with such Subsidiary's past practice, (C) regular quarterly cash dividends payable by HECO, HELCO and MECO in respect of shares of Subsidiary Preferred Stock, (D) a special cash dividend in respect of shares of Company Common Stock payable by the Company immediately prior to the Effective Time in the amount of $0.50 per share of Company Common Stock and (E) the Distribution pursuant to the Bank Spin-Off Agreements;

(ii) split, combine, consolidate, subdivide or reclassify any of its capital stock, other equity interests or voting securities, or securities convertible into or exchangeable or exercisable for capital stock or other equity interests or voting securities, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for its capital stock, other equity interests or voting securities, other than as permitted by Section 5.01(a)(iv) or as required to effect the Bank Spin-Off;

(iii) repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any capital stock or voting securities of, or equity interests in, the Company or any Company Subsidiary or any securities of the Company or any Company Subsidiary convertible into or exchangeable or exercisable for capital stock or voting securities of, or equity interests in, the Company or any Company Subsidiary, or any warrants, calls, options or other rights to acquire any such capital stock, securities or interests, other than (A) the acquisition by the Company of shares of Company Common Stock (1) in the open market to satisfy its obligations under all Company Benefit Plans or under the Company DRIP, in accordance with the terms of such plans and (2) in connection with the surrender of shares of Company Common Stock by holders of Company Stock Options in order to pay the exercise price thereof, (B) the withholding of shares of Company Common Stock to satisfy tax obligations with respect to awards granted pursuant to the Company Stock Plans, (C) the acquisition by the Company of awards granted pursuant to the Company Stock Plans in connection with the forfeiture of such awards and (D) under the Equity Forward Contract;

(iv) issue, deliver, sell, grant, pledge or otherwise encumber or subject to any Lien (A) any shares of capital stock of the Company or any Company Subsidiary, (B) any other equity interests or voting securities of the Company or any Company Subsidiary, (C) any securities convertible into or exchangeable or exercisable for capital stock or voting securities of, or other equity interests in, the Company or any Company Subsidiary, (D) any warrants, calls, options or other rights to acquire any capital stock or voting securities of, or other equity interests in, the Company or any Company Subsidiary, (E) any rights issued by the Company or any Company Subsidiary that are linked in any way to

39

the price of any class of Company Common Stock or any shares of capital stock of any Company Subsidiary, the value of the Company, any Company Subsidiary or any part of the Company or any Company Subsidiary or any dividends or other distributions declared or paid on any shares of capital stock of the Company or any Company Subsidiary or (F) any Company Voting Debt, in each case other than (x) the issuance, in the ordinary course of business consistent with past practice, of shares of Company Common Stock upon the exercise of Company Stock Options or pursuant to the settlement of Company Restricted Shares or Company Restricted Stock Units, including such awards granted under the Company's Long-Term Incentive Plan, in each case outstanding on the date of this Agreement and in accordance with their terms on the date of this Agreement or granted after the date of this Agreement to the extent permitted by this Agreement and (y) the issuance of shares of Company Common Stock (including newly issued shares) under the Company DRIP and under the Equity Forward Contract, _provided_ that issuances under this clause (y) are solely in connection with the financing of capital expenditures permitted under Section 5.01(a)(xi) hereof and are made in compliance with applicable orders of the HPUC (including with respect to required debt-to-equity ratios) or in amounts necessary to maintain the present capital structure of the Company consistent with past practice;

(v) (A) grant to any Company Personnel any increase in compensation or benefits (including paying to any Company Personnel any amount not due) other than in the ordinary course consistent with past practice and in no event in a manner more favorable than the course of practice disclosed by the Company to Parent prior to the date hereof, (B) grant to any Company Personnel any increase in change in control, severance or termination pay, (C) establish, adopt, enter into, amend in any material respect or terminate any Company Union Contract or Company Benefit Plan or Company Benefit Agreement (or any plan or agreement that would be a Company Union Contract, Company Benefit Plan or Company Benefit Agreement if in existence on the date hereof) or (D) take any action to accelerate the time of vesting, funding or payment of any compensation or benefits under any Company Benefit Plan or Company Benefit Agreement, except in the case of the foregoing clauses (A) through (D) for actions required pursuant to the terms of any Company Benefit Plan or Company Benefit Agreement, and otherwise in accordance with the terms and conditions of this Agreement;

(vi) (A) hire, terminate or promote any individual who is or would be Company Personnel, except in the case of individuals below the level of Vice President (or individuals who would be below the level of Vice President following such promotion) in the ordinary course of business consistent with practice or (B) transfer any individual to any of the Bank Subsidiaries, or transfer any individual from a Bank Subsidiary to the Company or any Company Subsidiary (other than the Bank Subsidiaries);

(vii) make any material change in financial accounting methods, principles or practices, except insofar as may have been required by a

change in GAAP or by any Governmental Entity (including the SEC or the PCAOB) (in each case after the date of this Agreement);

(viii) make any acquisition of a business (including by merger, consolidation or acquisition of stock or assets);

(ix) other than purchases and sales of inventory and supplies in the ordinary course of business, consistent with past practice, (A) acquire or agree to acquire any tangible properties or assets, (B) sell, lease (as lessor), license, mortgage, sell and leaseback or otherwise dispose of (other than dispositions to the Company and any Company Subsidiary (other than the Bank Subsidiaries)) any tangible property or assets or (C) encumber or subject to any Lien any tangible properties or assets or any interests therein, in each case, that individually or in the aggregate, have a fair market value in excess of $50 million;

(x) incur any Indebtedness, except for, in each case, in the ordinary course consistent with past practice, (A) as reasonably necessary to finance capital expenditures permitted under Section 5.01(a)(xi) hereof and to comply with applicable orders of the HPUC (including with respect to required debt-to-equity ratios) or to maintain the present capital structure of the Company consistent with past practice, (B) Indebtedness in replacement of existing Indebtedness, *provided* that (x) the Distribution, the Integrated Mergers and other transactions contemplated hereby shall not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or any loss of a material benefit under, or result in the creation of any Lien, under such replacement Indebtedness, (y) such replacement Indebtedness shall be on substantially similar terms or terms that are more favorable to the Company, and shall be for the same or lesser principal amount, as the Indebtedness being replaced and (z) such replacement Indebtedness shall be prepayable by the Company or the Company Subsidiaries, as applicable, at any time without premium or penalty and on same day notice, (C) guarantees by any Company Subsidiary of Indebtedness of any other Company Subsidiary (other than the Bank Subsidiaries) existing as of the date of this Agreement or permitted to be incurred by any such Subsidiary after the date hereof, (D) guarantees and other credit support by the Company of obligations of any Company Subsidiary (other than the Bank Subsidiaries), (E) borrowings under existing revolving credit facilities (or replacements thereof on comparable terms) or existing commercial paper programs or (F) Indebtedness in amounts necessary to maintain the capital structure of the Company Subsidiaries, as authorized by the HPUC, and to maintain the present capital structure of the Company consistent with past practice;

(xi) make, or agree or commit to make, any capital expenditure in any fiscal year except (A) in accordance with the capital plan set forth in Section 5.01(a)(xi) of the Company Disclosure Letter, plus a ten percent (10%) variance for each principal category set forth in such capital plan, (B) for

capital as and when required to respond consistent with past practice to operational emergencies, equipment failures or outages and (C) as required by Law or a Governmental Entity, including the HPUC;

(xii)   (A) other than in the ordinary course of business consistent with past practice and in each case other than with respect to the Equity Forward Contract, (1) enter into, terminate or amend in any material respect any material Contract, (2) consent to any extension or continuation of any material Contract or take any other action which would result in a material Contract to continue or be extended that would otherwise terminate or expire without the taking of such action or (3) waive any material right under any material Contract, (B) enter into, terminate or amend in any material respect any Contract of the type referred to in clauses (ii) or (iii) of Section 3.15(a), (C) terminate or amend in any material respect the Equity Forward Contract or (D) issue or release any request for proposal or bid request, or initiate or carry on any similar process, with a view to negotiating or entering into any Contract contemplated by clauses (A) or (B) hereof;

(xiii)   make any material Tax election (other than a Section 336(e) Election), change any material method of Tax accounting, settle or compromise any material Tax liability, claim or assessment or agree to an extension or waiver of the limitation period to any material Tax claim or assessment, grant any power of attorney with respect to material Taxes, enter into any closing agreement with respect to any material Tax or refund or amend any material Tax Return, in each case other than in the ordinary course of business consistent with past practice or as required by Law or to consummate the Bank Spin-Off;

(xiv)   except as disclosed in Section 5.01(a)(xiv) of the Company Disclosure Letter or with respect to any of the Bank Subsidiaries in order to facilitate consummation of the Bank Spin-Off, adopt any amendment to the certificate of incorporation or bylaws (or other equivalent organizational documents);

(xv)   take any action that would result in the Company or any Company Subsidiary (other than the Bank Subsidiaries) becoming subject to any restriction not in existence on the date hereof with respect to the payment of distributions or dividends;

(xvi)   waive, release, assign, settle or compromise any claim, action, suit or proceeding, other than waivers, releases, assignments, settlements or compromises that (A) with respect to the payment of monetary damages, involve only the payment of monetary damages (I) equal to or less than the amounts specifically reserved with respect thereto on the balance sheet of the Company as of September 30, 2014 included in the Filed Company Reports or (II) that do not exceed $10,000,000 in the aggregate and (B) with respect to any non-monetary terms and conditions therein, impose or require actions that would

not reasonably be expected, individually or in the aggregate, to be materially adverse to the Company and the Company Subsidiaries (other than the Bank Subsidiaries), taken as a whole;

    (xvii) take any action that would be reasonably likely to delay or hinder the consummation of the Integrated Mergers or that would present a significant risk of materially delaying or making it materially more difficult for the Company or any Company Subsidiary to obtain the Required Consents and the Company Required Statutory Approvals; or

    (xviii) authorize, agree in writing or otherwise or enter into any Contract to do any of the foregoing.

    (b) <u>Conduct of Business by Parent</u>. Except as otherwise expressly permitted or as otherwise contemplated by this Agreement or with the prior written consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement to the Effective Time, Parent shall not and shall not permit any Parent Subsidiary to take any action, other than as contemplated by this Agreement, that would be reasonably likely to delay or hinder the consummation of the Integrated Mergers, including seeking to acquire or acquiring any "electric utility company" or "gas utility company" (as each such term is defined in Section 366.1 of FERC's regulations (18 CFR § 366.1) or any oil trading or distribution company, in each case in the State of Hawaii, other than the transactions contemplated by this Agreement, that would present a significant risk of materially delaying or making it materially more difficult for the Parent, Merger Sub I, Merger Sub II or the Company to obtain their respective Required Consents, the Parent Required Statutory Approvals and the Company Required Statutory Approvals.

    (c) <u>No Control of the Company's Business</u>. Parent acknowledges and agrees that (i) nothing contained in this Agreement is intended to give Parent, directly or indirectly, the right to control or direct the operations of the Company or any Company Subsidiary prior to the Effective Time and (ii) subject to the covenants, agreements and obligations of the Company and the Company Subsidiaries set forth in this Agreement prior to the Effective Time, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and the Company Subsidiaries' respective operations.

    (d) <u>Advice of Changes</u>. Each of Parent and the Company shall promptly advise the other orally and in writing of any change or event that would prevent any of the conditions precedent described in Article VII from being satisfied.

    SECTION 5.02    <u>HPUC Proceedings</u>. Between the date of this Agreement and the Closing, the Company and the Company Subsidiaries shall (a) diligently pursue the rate cases and other proceedings set forth on Section 5.02 of the Company Disclosure Letter (collectively, the "<u>HPUC Proceedings</u>") consistent with past practice, and (b) to the extent permitted by Law, (i) promptly notify Parent about any material developments, or material communications with the HPUC relating thereto and (ii) to the extent reasonably practicable, timely provide draft copies of all material communications, filings and submissions to Parent

43

# Model Merger Agreement for the Acquisition of a Public Company

Mergers and Acquisitions Committee



AMERICAN BAR ASSOCIATION
Business Law Section

The materials contained herein represent the opinions of the authors and editors and should not be construed to be the action of either the American Bar Association or the Business Law Section, unless adopted pursuant to the bylaws of the Association.

Nothing contained herein is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

The Prefaces, Appendices, and Commentary in the *Model Merger Agreement for the Acquisition of a Public Company* are protected under United States copyright law and may not be reproduced in any manner without express permission. The Model Merger Agreement itself and its ancillary Agreements, including alternative Agreement language contained within the Commentary, as they appear in the printed publication and on its accompanying CD-ROM, may be freely reproduced by the reader.

The set of files on the CD-ROM accompanying the *Model Merger Agreement for the Acquisition of a Public Company*, may only be used on a single computer or moved to and used on another computer unless modified by the user. Under no circumstances may the set of files be used on more than one computer at one time. For permission, contact the ABA Copyrights and Contracts Department at copyright@americanbar.org or via fax at 312-988-6030, or complete the online form at http://www.americanbar.org/utility/reprint.html.

© 2011 American Bar Association. All rights reserved.

Printed in the United States of America.

Cover design by ABA Publishing.

Page composition by Quadrum Solutions.

Library of Congress Cataloging-in-Publication Data

Model Merger Agreement for the Acquisition of a Public Company / Diane Holt Frankle, editor.

p. cm.

Mergers and Acquisitions Committee, Subcommittee on Public Company Acquisitions, editor of the project; Diane Holt Frankle, chair.

ISBN 978-1-61632-997-6 (alk. paper)

1. Consolidation and merger of corporations—United States. I. Frankle, Diane Holt.

KF1477.M635 2011

346.73'06626—dc23

2011028303

Discounts are available for books ordered in bulk. Custom covers are also available for bulk orders. Special consideration is given to state and local bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60654-7598.

www.ababooks.org

15  14  13  12  11       5  4  3  2  1

### 4.1 Operation of the Company's Business

and preserving its business if the contemplated transaction does not close. Of course, an announced sale puts tremendous stress on an organization both internally (as each employee will be trying to understand the implications of the merger to him or her) and externally (as competitors try to take advantage of the uncertainty surrounding the transaction and the target's future). Customers also may be nervous about the effect of the transaction on the target and the products or services they are buying from the target, including the implication of the transaction on after-sales service and support and other activities that require a long-term commitment.

The effect of Section 4.1(b), discussed below, which prohibits a number of steps the target might otherwise take to maintain good relations with these constituencies, also should be considered.

The target might have several comments on clause (ii).

First, the target might be concerned about the breadth of the reference to third parties; the relationships with landlords, creditors, and others are usually controlled by tight contractual provisions, which still remain in force after the merger agreement is signed. From an ongoing perspective, the target may argue that lenders should not be a concern to the buyer, which will often have its own credit arrangements. "Other persons having business relationships" may simply be too broad a class.

Second, as noted above, "the Company and each of its Subsidiaries" may be too large a class and include subsidiaries that are immaterial.

Third, the target might suggest some standard of materiality associated with its obligation, such as "in all material respects."

Accordingly, the target might suggest that this clause be rewritten to say:

> *use commercially reasonable efforts to ensure that the Company and each of its Subsidiaries <u>that is a Significant Subsidiary (as defined in Regulation S-X)</u> preserve intact their current business organizations, keep available the services of their current officers, and key employees and maintain their relations and goodwill with all material suppliers and customers, <u>landlords, creditors, licensors, licensees, employees and other Persons having business relationships with the Company and each of its Subsidiaries, respectively;</u>*

(b) **During the Pre-Closing Period (except with the prior written Consent of Parent), the Company shall not, and shall not permit any of its Subsidiaries to:**



127

*Model Merger Agreement for the Acquisition of a Public Company*

### COMMENT

In contrast to the affirmative covenants in Section 4.1(a), which tend to be general in nature (such as the covenant to comply with applicable legal requirements), the negative covenants often pinpoint specific prohibited activities, such as the payment of dividends. Negative covenants are expected in a public deal, but, as noted above, they may present significant concerns to the target if they impede the ordinary operations of the target, or the target's ability to respond to changing circumstances, particularly if the time between signing and closing is significant.

**Target's Response.** The target may respond to this lead-in language on several fronts.

The target might ask that the phrase, "which shall not be unreasonably withheld, conditioned. or delayed" be added in the parenthetical after "Parent" on the basis that, particularly with respect to negative covenants, the target will need to respond to operating conditions in its business.

It might also request that the prohibition not apply to insignificant subsidiaries, on the basis that actions taken by an insignificant subsidiary could have no effect on the buyer. It could do so by adding the phrase "which is a 'Significant Subsidiary'" after "Subsidiaries."

As with the affirmative covenants in Section 4.1(a), discussed above, if the buyer is not willing to insert, "which shall not unreasonably be withheld, conditioned, or delayed" in this lead-in, it might agree to such limits with respect to individual specified negative covenants.

(i) (A) declare, set aside, or pay any dividends on, or make any other distributions (whether in cash, stock, or property) in respect of, any of its capital stock or other equity or voting interests, except for dividends by a direct or indirect wholly owned Subsidiary of the Company to its parent, (B) split, combine, or reclassify any of its capital stock or other equity or voting interests, or issue or authorize the issuance of any other securities in respect of, in lieu of, or in substitution for shares of its capital stock or other equity or voting interests, (C) purchase, redeem, or otherwise acquire any shares of capital stock or any other securities of the Company or any of its Subsidiaries or any options, warrants, calls, or rights to acquire any such shares or other securities (including any Company Stock Options or shares of restricted stock except pursuant to forfeiture conditions of such restricted stock) or (D) take any action that would result in any change of any term (including any conversion price thereof) of any debt security of the Company or any of its Subsidiaries;

4.1  Operation of the Company's Business

(xi) enter into any Material Contract:

(A) except in the ordinary course of business consistent with past practice;

(B) if consummation of the Contemplated Transactions or compliance by the Company with the provisions of this Agreement will conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time or both) under, or give rise to a right of, or result in, termination, cancellation, or acceleration of any obligation or to a loss of a material benefit under, or result in the creation of any Encumbrance in or upon any of the properties or assets of the Company or any of its Subsidiaries or Parent or any of its Subsidiaries under, or give rise to any increased, additional, accelerated, or guaranteed rights or entitlements under, any provision of such Contract; or

(C) that in any way purports to restrict the business activity of the Company or any of its Subsidiaries or any of their Affiliates or to limit the freedom of the Company or any of its Subsidiaries or any of their Affiliates to engage in any line of business or to compete with any Person or in any geographic area.



### COMMENT

A target will need to review this covenant to ensure that these restrictions do not impinge on its normal business activities. As discussed above, actions by the buyer to restrict the target's right to enter into material contracts in the ordinary course of business may have antitrust gun-jumping implications.

(xii) amend, modify, change, or terminate any Material Contract to which the Company or any of its Subsidiaries is a party, or waive, release, or assign any rights or claims thereunder, in each case other than in the ordinary course of business;

### COMMENT

The buyer will want to preserve the existing status of the material contracts, but will also want to avoid a gun-jumping issue, by permitting amendments in the ordinary course of business.

**Target's Response.** The target might seek to limit this provision, by for example adding a further limitation to the covenant, such as limiting the prohibition on amendments or terminations to those that are "materially adverse to the Company and its Subsidiaries, taken as a whole."

137

(xiii) except as required by applicable Legal Requirements, adopt or enter into any collective bargaining agreement or other labor union Contract applicable to the employees of the Company or any of its Subsidiaries;

**COMMENT**

This covenant prohibits the target from entering into collective bargaining agreements. Because this covenant is qualified by "except as required by law," many targets would find it acceptable.

(xiv) hire any new employee at the level of [manager] or above or with an annual base salary in excess of $_____$, promote any employee except in order to fill a position vacated after the date of this Agreement, or engage any independent contractor whose engagement may not be terminated by the Company without penalty on 30 days' notice or less;

**COMMENT**

Some target employees or consultants may not be needed in the combined organization. This covenant seeks to avoid exacerbating the situation by new hires. This covenant is directed at a particular level (the "manager" level would need to be changed to the terminology used in the target's structure) or a highly paid employee. There are various formulations of this covenant, depending upon the buyer's concern and the target's needs. For example, some buyers may limit this covenant to officers only, while other buyers may restrict hires at above specific base compensation levels rather than referencing the management structure of the target.

**Target's Response.** A possible response is to delete the covenant entirely on the basis that it relates to the ordinary business of the target. Alternatively, the target may agree to some restrictions on hiring but seek to tailor the provision to permit the conduct of its business in the ordinary course.

(xv) increase in any manner the compensation or benefits of, or pay any bonus to, any employee, officer, director, or independent contractor of the Company or any of its Subsidiaries, except for such increases or bonuses that were disclosed to Parent prior to the date of this Agreement;

**COMMENT**

This covenant prohibits increases in compensation of, or payments of bonuses to, the target's employees, officers, directors, or consultants, except those previously communicated to the buyer. A buyer might be willing to permit increases of compensation for nonexecutive officer employees consistent with past practices, particularly for targets that have rolling compensation increases, regardless of whether they had been communicated.