IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HU HONUA BIOENERGY, LLC, a Delaware Limited Liability Company,<br><br>                    Plaintiff,<br><br>    v.<br><br>HAWAIIAN ELECTRIC INDUSTRIES, INC., et al.,<br><br>                    Defendants. | CIV. NO. 16-00634 JMS-KJM<br><br>ORDER (1) AFFIRMING MAGISTRATE JUDGE'S ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF HU HONUA BIOENERGY, LLC'S MOTION FOR LEAVE TO FILE THIRD AMENDED AND SUPPLEMENTAL COMPLAINT AND FOR PERMISSIVE JOINDER, ECF NO. 243; AND (2) DENYING FURTHER LEAVE TO AMEND ANTITRUST CLAIMS |

**ORDER (1) AFFIRMING MAGISTRATE JUDGE'S ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF HU HONUA BIOENERGY, LLC'S MOTION FOR LEAVE TO FILE THIRD AMENDED AND SUPPLEMENTAL COMPLAINT AND FOR PERMISSIVE JOINDER, ECF NO. 243; AND (2) DENYING FURTHER LEAVE TO AMEND ANTITRUST CLAIMS**

## I.  INTRODUCTION

Plaintiff Hu Honua Bioenergy, LLC ("Hu Honua") moves for leave to file a Third Amended and Supplemental Complaint for Permissive Joinder ("proposed TAC") in this longstanding breach of contract and antitrust action.

ECF No. 216.  After Hawaiian Electric Light Company, Inc. ("HELCO")[1] canceled an agreement to buy power from Hu Honua in 2016, Hu Honua brought suit against HELCO and others.  In 2017, several parties negotiated a settlement that included an amended agreement, with the settlement contingent on the State of Hawaii Public Utilities Commission's ("PUC") approval of the new agreement. ECF No. 88 at PageID.880.  After several years of legal proceedings, the PUC rejected the renegotiated agreement, and on appeal, the Hawaii Supreme Court affirmed the PUC.

Given no settlement, Hu Honua now returns to this court to resume pursuit of its breach of contract and antitrust claims against Defendants.  Hu Honua's proposed TAC seeks to add a new Clayton Act claim, modify its Sherman Act claims, and add three new defendants.  ECF No. 216-4 at PageID.6102–6103, 6224–6237.  Defendants opposed these amendments, arguing that they are futile. The Magistrate Judge agreed in an April 2, 2024 Order.  ECF No. 243 ("April 2, 2024 Order").  Hu Honua now appeals that decision to this court.

For the reasons stated below, this court affirms.

_____

[1] Hawaiian Electric Industries, Inc. ("HEI"), Hawaiian Electric Company ("HECO"), and HELCO are the only remaining defendants in this suit.  HEI is a holding company, with HECO as one of its subsidiaries.  ECF No. 216-3 at PageID.6011.  In turn, HELCO is a subsidiary of HECO.  *Id.*  When appropriate, this Order collectively refers to these three entities as "Defendants."  Former defendants NextEra Energy Inc. ("NextEra") and Hamakua Energy Partners, L.P. ("HEP") have been dismissed from this action.

2

## II. **BACKGROUND**

### A.      **Factual and Procedural Background**

This case has a long and complex history.  Some of that history is explained in two of this court's prior orders—*Hu Honua Bioenergy, LLC v. Hawaiian Elec. Indus., Inc*., 2018 WL 491780 (D. Haw. Jan. 19, 2018) ("*Hu Honua I*") and *Hu Honua Bioenergy, LLC v. Hawaiian Elec. Indus., Inc*., 2018 WL 5891743 (D. Haw. Nov. 9, 2018) ("*Hu Honua II*").  This Order does not repeat the full background of the litigation to date, but instead assumes familiarity with *Hu Honua I* and *Hu Honua II* and sets forth the facts necessary to place the current appeal in context.

In 2012, Hu Honua and HELCO entered into a Power Purchase Agreement ("PPA") "for the generation and sale of electricity from a renewable, dispatchable firm energy biomass power plant" on the Big Island of Hawaii.  ECF No. 216-3 at PageID.6022.  The PUC approved the PPA in December 2013.  *Id.* at PageID.6026.  Given problems with the construction contractor and other labor issues, Hu Honua was unable to complete the facility on time.  *Id.* at PageID.6037 n.10.  Citing delays and missed construction milestones, HELCO terminated its PPA with Hu Honua in August 2016.  *Id.* at PageID.6045–6046.

3

In November 2016, Hu Honua filed this suit against Defendants, in addition to NextEra (a large Florida-based utility holding company that was seeking to acquire HECO and HELCO) and HEP (then-owner of the independent Hamakua power plant), asserting breach of contract and antitrust claims.  ECF No. 1.  Among other assertions, Hu Honua alleged—and in the proposed TAC, continues to allege—that the construction and labor problems that plagued Hu Honua's project were merely a pretext for HELCO's termination of the PPA.  ECF No. 1 at PageID.32–36, 56; ECF No. 216–3 at PageID.6034–6035.

The proposed TAC alleges an anticompetitive scheme involving HECO's acquisition of another power plant in Hamakua (the "Hamakua plant") from HEP, which HELCO would then use to supply itself with power rather than buying it from Hu Honua.[2]  ECF No. 216-3 at PageID.6034–6035.  HECO had secured a right of first refusal binding HEP to sell the plant to HECO in the first instance.  *Id.* at PageID.6033.  But when HECO's plan to acquire the Hamakua plant was blocked by the PUC, HECO formed three "unregulated" subsidiaries,

---

[2]  The Hamakua plant is a generator of firm power.  ECF No. 216-3 at PageID.6008.  Hu Honua too was to provide firm power.  *Id.* at PageID.6029.  "Firm" power (generated by fossil fuels, geothermal, biomass, and similar sources) is power that is intended to be always available during "the period covered by a guaranteed commitment to deliver."  *Id.* at PageID.6018.  In contrast, "intermittent" power relies on sources that are not always available, "with output controlled by the natural variability of the energy resource (e.g., wind or sunshine) rather than energy dispatched based on system requirements."  *Id.*

allegedly in order to circumvent the PUC's ruling and acquire the Hamakua plant:
Pacific Current, LLC, Pacific Current's subsidiary Hamakua Holdings, LLC, and
Hamakua Holdings' subsidiary Hamakua Energy, LLC.  *Id.* at PageID.6051–6052.
Through Pacific Current, HECO successfully acquired the Hamakua plant in
November 2017.  *Id.* at PageID.6052–53.[3]  And according to Hu Honua, given that
they already had plans to buy the Hamakua plant in August 2016, Defendants no
longer needed or wanted to purchase power from Hu Honua, so they used
construction delays as a pretext for terminating the PPA.  *Id.* at PageID.6037.

    After the initial complaint was filed in this case, Hu Honua and
Defendants settled their aspect of the dispute, entering into a May 2017 Amended
and Restated PPA ("Amended PPA").  That Amended PPA was approved by the
PUC in July 2017, but, as set forth below, that approval was later rescinded.  After
Defendants had conditionally settled with Hu Honua, NextEra and HEP moved to
dismiss, arguing, among other grounds, that Hu Honua lacked antitrust standing.
ECF No. 95 at PageID.976.  The court agreed, holding that Hu Honua had not

---

[3]  Although Hu Honua has alleged that the Hamakua acquisition was part of Defendants'
anticompetitive scheme since the filing of its original Complaint, ECF No. 1 at PageID.32–33, it
did not specifically focus its Sherman and Clayton Act claims on that acquisition until its
proposed TAC.  *See* ECF No. 216-4 at PageID.6102–6103 (adding three new Defendants,
subsidiary companies allegedly created to acquire the Hamakua plant), 6224–6237 (alleging
anticompetitive harms from Hamakua acquisition).

adequately pled harm to competition, particularly given the pervasive regulation in the Hawaii energy market. *Hu Honua I*, 2018 WL 491780, at *9–*10.

Hu Honua was given an opportunity to file a Second Amended Complaint ("SAC"), which it did in January 2018. ECF No. 138. After Hu Honua and HEP settled, NextEra moved to dismiss the SAC, again arguing that Hu Honua lacked antitrust standing. This court again agreed—although Hu Honua had modified its complaint, its allegations of antitrust injury remained speculative. *See Hu Honua II*, 2018 WL 5891743, at *9. As a result, the court dismissed the federal antitrust claims against NextEra. *Id.* at *11.

Meanwhile, in August 2017, Life of the Land ("LOL"), a non-profit environmental group, appealed the PUC's approval of the Amended PPA to the Hawaii Supreme Court.[4] After significant litigation before the PUC and Supreme Court, the Amended PPA was eventually rejected by the Supreme Court in March, 2023. *Matter of Hawai'i Elec. Light Co., Inc.*, 152 Haw. 352, 354, 526 P.3d 329, 331 (2023).[5] That is, as of now, Hu Honua has no power purchase agreement—it cannot sell power on the Big Island. And with the settlement agreement between

---

[4] Pursuant to HRS §§ 91-14(b) and 269-15.51(a), any contested case decision by the PUC is appealed directly to the Hawaii Supreme Court.

[5] Given ongoing proceedings in the Hawaii Supreme Court, the court administratively closed the action on June 6, 2019. *See* ECF No. 186. The court reopened proceedings on November 7, 2023, after the Amended PPA was finally rejected. *See* ECF No. 206.

6

Hu Honua and Defendants no longer valid given the rejection of the Amended

PPA, Hu Honua now seeks to file its proposed TAC.

Specifically, Hu Honua seeks to make three substantive amendments

to its antitrust claims that—if permitted—would substantially refocus the claims on

Defendants' acquisition of the Hamakua plant in 2017.[6]  The first is adding an

entirely new Clayton Act claim (and equivalent state law claim) focusing on the

Hamakua acquisition.  ECF No. 216-3 at PageID.6069–6070; ECF No. 216-4 at

PageID.6232–6234.  The second is modifying the Sherman Act federal and

equivalent state law claims to incorporate the Hamakua acquisition as part of the

alleged anticompetitive scheme (including tailoring Count III to specifically target

HELCO's agreement with HEP to a right of first refusal to purchase the Hamakua

plant).  ECF No. 216-3 at PageID.6070–6073; ECF No. 216-4 at PageID.6234–

6237.  The third is the joinder of the three subsidiaries that HECO created in fall of

2017 to purchase the Hamakua plant as defendants.  ECF No. 216-3 at

PageID.6011–6012; ECF No. 216-4 at PageID.6102–6103.

The April 2, 2024 Order examined Hu Honua's retailored claims and

determined, among other things, that Hu Honua fails to establish the requisite

---

[6]  The April 2, 2024 Order granted leave to file the proposed TAC in part, including
removing claims against NextEra and HEP, pleading certain facts post-dating the SAC, and
dropping four state law claims.  *See* ECF No. 243 at PageID.6748.  *See generally* ECF No. 216-4
(redline of SAC to proposed TAC).  Those rulings have not been appealed to this court.

antitrust standing, so it would be futile to grant Hu Honua leave to amend the contested antitrust claims.  For the reasons that follow, and based on a de novo review, this court agrees.

**B.    Timeline of Events**

The history of this dispute involves overlapping proceedings before this court, the PUC, and the Hawaii Supreme Court.  A chronological timeline follows[7]:

| Date | Event |
| --- | --- |
| May 3, 2012 | HECO and Hu Honua enter into an initial PPA for the Hu Honua facility |
| December 20, 2013 | PUC approves the initial PPA |
| Early 2015 | HECO begins private negotiations with HEP to acquire Hamakua plant |
| June 20, 2015 | Hu Honua misses first construction milestone—pass boiler hydro test deadline |
| December 20, 2015 | Hu Honua misses second construction milestone—commercial operation date deadline |
| December 23, 2015 | HECO announces proposed acquisition of Hamakua plant publicly |
| January 15, 2016 | HELCO sends first PPA termination notice to Hu Honua |

_____

[7]  All events in this chronology are taken from the proposed TAC, unless otherwise indicated.

8

| Date | Event |
|------|-------|
| March 1, 2016 | HELCO sends second PPA termination notice to Hu Honua |
| August 25, 2016 | HELCO sends third PPA termination notice to Hu Honua |
| November 30, 2016 | Hu Honua files Complaint |
| January 27, 2017 | Hu Honua files its First Amended Complaint ("FAC") |
| May 4, 2017 | PUC rejects HECO's request to acquire Hamakua plant (PUC Order No. 34536) |
| May 9, 2017 | Defendants reach a settlement with Hu Honua conditioned on the PUC approval of the Amended PPA |
| July 28, 2017 | PUC approves the Amended PPA and grants a waiver from competitive bidding (PUC Order No. 34726) |
| August 26, 2017 | LOL appeals the PUC approval of the Amended PPA on procedural grounds[8] |
| September 2017 | HEI forms three subsidiaries, allegedly to circumvent PUC and acquire Hamakua plant |
| November 24, 2017 | HEI acquires Hamakua plant through subsidiaries |
| January 19, 2018 | This court grants NextEra and HEP's motion to dismiss FAC as to the federal antitrust claims (*Hu Honua I*) |
| January 29, 2018 | Hu Honua files its SAC |
| July 8, 2018 | Hu Honua dismisses claims against HEP based on settlement |

---

[8] *Matter of Hawai'i Elec. Light Co., Inc.*, 145 Haw. 1, 5, 445 P.3d 673, 677 (2019).

| Date | Event |
|------|-------|
| November 9, 2018 | This court grants NextEra's motion to dismiss SAC as to the federal antitrust claims (*Hu Honua II*) |
| May 10, 2019 | On LOL's appeal, the Hawaii Supreme Court vacates PUC's approval of the Amended PPA and remands to PUC ("*HELCO I*"), directing it to allow LOL to participate in proceeding[9] |
| July 9, 2020 | On remand, scope of Supreme Court decision is not clear to the PUC—unclear whether *HELCO I* vacated HELCO's competitive bidding waiver for the Amended PPA and the approval of the Amended PPA, or just the approval.  PUC decides the waiver was vacated, and declines to consider the merits of the Amended PPA (PUC Order No. 37205) |
| May 24, 2021 | On HELCO's appeal, the Supreme Court decides that *HELCO I* did not vacate HELCO's competitive bidding waiver and remands again for PUC to reconsider merits of approval of the Amended PPA ("*HELCO II*")[10] |
| May 23, 2022 | On remand, PUC rejects the Amended PPA (PUC Order No. 38395) |
| March 13, 2023 | Hawaii Supreme Court affirms PUC's rejection of the Amended PPA ("*HELCO III*")[11] |
| November 16, 2023 | Hu Honua moves for leave to file its proposed TAC |
| November 21, 2023 | Hu Honua voluntarily dismisses remaining claims against NextEra |

---

[9]  *Matter of Hawai'i Elec. Light Co., Inc.*, 145 Haw. at 24, 445 P.3d at 699.

[10]  *Matter of Hawai'i Elec. Light Co., Inc.*, 149 Haw. 239, 240, 487 P.3d 708, 709 (2021).

[11]  *Matter of Hawai'i Elec. Light Co., Inc.,* 152 Haw. 352, 354, 526 P.3d 329, 331 (2023).

| Date | Event |
|------|-------|
| April 2, 2024 | Magistrate Judge issues the April 2, 2024 Order denying in part Hu Honua's motion for leave to amend |
| April 16, 2024 | Hu Honua files Objections to the April 2, 2024 Order |
| April 30, 2024 | HELCO files Response |
| May 15, 2024 | Hu Honua files Reply |
| July 30, 2024 | District Court hearing on the Objections |

## C.     The Structure of the Electric Utility Market in Hawaii

### 1.     Overview

The court starts with the structure of the electric utility market in Hawaii.  Unlike on the continental United States—where states and utilities typically use large interconnected, interstate power grids comprised of high-voltage transmission lines—each island in the State of Hawaii has its own isolated grid and power supplies.  *Hu Honua I*, 2018 WL 491780 at *2; ECF No. 216-3 at PageID.6017.  Power supplied to electric utilities (which utilities then provide to retail consumers) is divided into two basic categories: "firm" power and "intermittent" power.  *Id.* at PageID.6017–6018.  As explained above, "firm" power is generated by fossil fuels, geothermal, biomass, and similar sources, and during "the period covered by a guaranteed commitment to deliver," firm power is intended to be available always.  *Id.* at PageID.6017–6018.  In contrast,

11

"intermittent" power consists of sources that are not always available, "with output controlled by the natural variability of the energy resource (e.g., wind or sunshine) rather than energy dispatched based on system requirements." *Id.* at PageID.6018.

HECO is the only public utility operating on the Big Island and serves approximately 88,000 customers. *Id.* at PageID.6019. "Of a reported market total of 259.65 MW (net) of firm generation capacity as of early 2023, HECO owns 235.65 MW, representing more than 90% of Hawaii Island's wholesale firm energy generating capacity." *Id.* at PageID.6020. HECO generates power itself, and also purchases wholesale power from independent power producers ("IPPs"), and sells it to residents and other customers. *Id.* at PageID.6019. One IPP, Puna Geothermal Venture, competes with HECO, with a current firm power capacity of 24 MW. *Id.* at PageID.6020.

## 2.   *Regulation*

This court has previously examined the statutes and regulations that impact the structure of the Hawaii electric utility market. The PUC must approve power purchase agreements between HELCO and IPPs (irrespective of whether they rely on fossil fuel or non-fossil fuel sources), in order for HELCO to recover the costs of the power purchase agreements from ratepayers. *See* Hawaii Revised Statutes ("HRS") § 269-16.22 ("All power purchase costs . . . arising out of power

purchase agreements that have been approved by the public utilities commission and are binding obligations on the electric utility company, shall be allowed to be recovered by the utility from the customer base of the electric utility company through one or more adjustable surcharges, which shall be established by the public utilities commission."); *see also* HRS § 269-27.2(c) ("The rate payable to the public utility to the producer for the nonfossil fuel generated electricity . . . shall be as agreed between the public utility and the supplier and as approved by the public utilities commission . . . .").  The prices that HELCO can charge for power from retail consumers are also "largely controlled by the Hawaii PUC."  *Hu Honua I*, 2018 WL 491780, at *11 (citing HRS § 269-16 ("All rates, fares, charges, classifications, schedules, rules, and practices made, charged, or observed by any public utility or by two or more public utilities jointly shall be just and reasonable and shall be filed with the public utilities commission.") and HRS § 269-16.22).

The PUC also controls utilities' entry into the market.  HRS § 269-7.5 ("No public utility . . . shall commence its business without first having obtained from the commission a certificate of public convenience and necessity.").  On the Big Island, the PUC has only authorized HECO to operate as a public utility. Therefore, "IPPs have no choice but to sell their power to HECO to reach retail consumers at scale."  *See* ECF No. 216-3 at PageID.6021.  "HECO has not

13

permitted the use of its grid for the 'wheeling' or transmission of power from IPPs to retail power purchasers, and it would be economically impractical for smaller independent producers to build their own transmission and distribution system for retail consumers." *Id.* at PageID.6021. As a result, HECO is the monopoly seller of electricity on the Big Island and has sole purchasing power over wholesale firm energy (monopsony power). *Id.* at PageID.6020–6021.

The court has previously described how IPPs like Hu Honua are impacted by Public Utilities Regulation Policies Act ("PURPA") in the context of the Hawaii electric utility market. *See Hu Honua I*, 2018 WL 491780, at *9–*10. PURPA was enacted in 1978, among other reasons, to "ensure sustained long-term economic growth by shifting the nation's reliance on oil and gas to more abundant domestically produced fuels." *Id.* at *10 (*citing Greensboro Lumber Co. v. Georgia Power Co.*, 643 F. Supp. 1345, 1371 (N.D. Ga. 1986)). To support development of non-traditional generating facilities, PURPA and its implementing regulations require electric utilities (a) to sell electric energy and capacity to qualifying facilities upon request, (b) to purchase electric energy and capacity from qualifying facilities and (c) to make all necessary interconnections with any qualifying facility in order to accomplish the aforementioned purchases and sales provided that each qualifying facility pay its share of the interconnection costs. *Id.*

14

(citing *Greensboro*, 643 F. Supp. at 1372 (footnotes omitted)).  Hu Honua is a qualifying facility under PURPA.  *Id.* at *9.

PURPA's "regulations mandate that an electric utility offer a qualifying facility built after the enactment of PURPA a purchase rate equal to, but no more than, the utility's 'full avoided costs.'"  *Id.* at *10 (citing *Greensboro,* 643 F. Supp. at 1372 (citations and footnote omitted)); *see also Schuylkill Energy Res., Inc. v. Penn. Power & Light Co.*, 113 F.3d 405, 411 (3d Cir. 1997) ("Pursuant to the regulations promulgated . . . under the authority of PURPA, [defendant utility] is required to purchase electric energy from [plaintiff].").

### III.  <u>STANDARDS OF REVIEW</u>

### A.    **Motion for Leave to Amend**

Under Federal Rule of Civil Procedure 15(a), leave to amend a pleading "shall be freely given when justice so requires."  *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387 (9th Cir. 1990).  "Although the rule should be interpreted with 'extreme liberality,' leave to amend is not to be granted automatically."  *Id.* (quoting *United States v. Webb,* 655 F.2d 977, 979 (9th Cir. 1981)).  "A trial court may deny such a motion if permitting an amendment would prejudice the opposing party, produce an undue delay in the litigation, or result in futility for lack of merit."  *Id.*  When a court denies leave to amend on the ground

of futility, it means that the court has reached the legal conclusion that the amended complaint could not withstand a Rule 12(b)(6) motion.  *See Illinois Nat. Ins. Co. v. Nordic PLC Const., Inc.*, 2013 WL 1337007, at *5 (D. Haw. Mar. 28, 2013); *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 40 (1st Cir. 2022); *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1434 (3d Cir. 1997); *In re Triangle Cap. Corp. Sec. Litig*., 988 F.3d 743, 750 (4th Cir. 2021); *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014); *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 737–38 (6th Cir. 2022); *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co*., 55 F.4th 517, 529 (7th Cir. 2022); *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1189 (10th Cir. 2012).

Thus, the "proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6)."  *Street v. Amazon.com Servs., LLC*, 2022 WL 3683811, at *2 (W.D. Wash. Aug. 25, 2022) (citing *Miller v. Rykoff-Sexton, Inc*. 845 F.2d 209, 214 (9th Cir. 1988), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009)); *Murrey v. Minc*, 2021 WL 3772679, at *4 (C.D. Cal. Jan. 13, 2021) (same); *see also Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs*., 727 F.3d 917, 927 (9th Cir.

2013) (denying leave to amend where additional allegations would be insufficient under *Iqbal* and *Twombly*).[12]

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Such a dismissal is proper "based

---

[12]  In addition to determining that Hu Honua's proposed TAC would not withstand a Rule 12(b)(6) motion, the Magistrate Judge held that "no set of facts can be proved under the amendment to [Hu Honua's] pleadings that would constitute a valid claim."  ECF No. 243 at PageID.6747 (citing *Miller*, 845 F.2d at 214).  This court, however, does not agree that the "no set of facts" standard applies to determining whether a proposed amended complaint is futile based on failure to state a claim.  The continued use of the now-retired "no set of facts" formulation is likely based on the historic use of that test.  At the time *Miller* was decided, the standard for futility of a Rule 15(a) motion to amend and for a Rule 12(b)(6) motion to dismiss were both whether "no set of facts can be proved" to entitle the plaintiff to relief (i.e. the pre-*Twombly* pleading standard).  *See Miller*, 845 F.2d at 214 ("[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.") (citing J. Moore, *Moore's Federal Practice* ¶ 15.08[4] (2d ed. 1974) (concluding that the proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6)); *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."), *abrogated by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

But, certainly in the context of a Rule 12(b)(6) motion, the "no set of facts" standard is no longer applicable.  *See Twombly*, 550 U.S. at 546 (overruling *Conley* and replacing the "no set of facts" standard with the present plausibility standard).  And, as set forth above, many circuits, post-*Twombly*, have held that that the proper standard to determine whether an amendment is futile is whether the claim would survive a Rule 12(b)(6) motion to dismiss.

Nevertheless, there is likely some life remaining in the "no set of facts" formulation.  After granting a Rule 12(b)(6) motion, courts are faced with deciding whether to permit leave to amend, or whether granting such leave would be futile.  In determining whether to grant leave to amend (again, not in relation to a Rule 15 motion, but after granting a Rule 12(b)(6) motion), the court can certainly ask whether "no set of facts" could cure the deficiency.  If so, leave to amend should not be granted; if not, leave should be granted.

Regardless, it makes little sense to use the "no set of facts" inquiry where the court is being asked to determine if a particular amendment (here, the proposed TAC) states a claim.  Thus, the court applies the Rule 12(b)(6) standard to determine whether amendment is futile— that is, it evaluates whether Hu Honua's proposed TAC states a claim for relief that is plausible.

on the lack of a cognizable legal theory or the absence of sufficient facts alleged."

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th

Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

1988)).  The complaint "must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 570).

 "The plausibility standard . . . asks for more than a sheer possibility

that a defendant has acted unlawfully."  *Id.*  A complaint must "nudge" the

plaintiff's claims "across the line from conceivable to plausible."  *Nielsen v.*

*Thornell*, 101 F.4th 1164, 1169 (9th Cir. 2024) (quoting *Twombly,* 550 U.S. at

570).  Determining plausibility is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556

U.S. at 679 (citation omitted).  In reviewing plausibility:

> First, a court should identify pleadings that, because they
> are no more than conclusions, are not entitled to the
> assumption of truth.  Then, a court should assume the
> veracity of well pleaded factual allegations and determine
> whether they plausibly give rise to an entitlement to
> relief.  Where a complaint pleads facts that are merely
> consistent with a defendant's liability, it stops short of
> the line between possibility and plausibility of
> entitlement to relief.  When considering plausibility,
> courts must also consider an obvious alternative
> explanation for defendant's behavior.

*Eclectic Properties E., LLC v. Marcus & Millichap Co*., 751 F.3d 990, 995–96 (9th Cir. 2014) (citations and quotation marks omitted).  And in analyzing these principles in the antitrust context, *Twombly* recognized that "proceeding to antitrust discovery can be expensive," and reiterated that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  *Twombly*, 550 U.S. at 558 (second quotation quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

## B.    Review of a Magistrate Judge's Order

In general, a motion for leave to amend may be decided by a Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(A) (authorizing district court judges to designate magistrate judges "to hear and determine any pretrial matter," and enumerating eight exceptions that do not include a motion to amend); *Seto v. Thielen*, 519 F. App'x 966, 969 (9th Cir. 2013) ("A motion for leave to amend is a nondispositive motion which a magistrate judge may properly decide.").  Here, the Magistrate Judge decided this motion and issued an order, as opposed to findings and recommendations.  *Compare* Fed. R. Civ. P. 72(a) (requiring a magistrate judge to issue a written order when deciding a nondispositive matter), *with* Fed. R.

Civ. P 72(b)(1) (requiring a magistrate judge to issue findings and recommendations when deciding a dispositive matter).

Denial of a motion to amend seeking to add a new claim or party, however, is dispositive as to that claim or party.  Thus, some courts, including this one, have reasoned that the denials of such motions to amend are dispositive and should be reviewed de novo.  *See McAllister v. Adecco USA Inc.*, 2017 WL 2818198, at *4 n.5 (D. Haw. June 29, 2017) ("[W]here an amendment is denied as futile, the ruling is akin to a motion to dismiss for failure to state a claim. . . .  A motion to dismiss for failure to state a claim is expressly excepted under § 636(b)(1)(A), falls under § 636(b)(1)(B), and is subject to de novo review.") (internal citations and quotation marks omitted); *see also, e.g., Gossett v. Stewart*, 2009 WL 3379018, at *1 (D. Ariz. Oct. 20, 2009); *Cuenca v. Univ. of Kan.*, 205 F. Supp. 2d 1226, 1228 (D. Kan. 2002).

Because the denial was dispositive of Hu Honua's new claims, and was decided on Rule 12(b)(6) grounds, the court reviews this matter de novo.

## IV. <u>DISCUSSION</u>

Hu Honua seeks to add a new claim asserting a violation of § 7 of the Clayton Act, and to substantially modify its claims under § 1 and § 2 of the Sherman Act to focus on the acquisition of the Hamakua plant.  *See* ECF No. 216-

3 at PageID.6065–6073; ECF No. 216-4 at PageID.6224–6237.  The April 2, 2024

Order denied leave to amend on two grounds: the new Clayton Act claim's statute

of limitations had expired and the new claims failed to relate back to an earlier

time, and all of Hu Honua's antitrust claims fail for lack of antitrust standing

(specifically, Hu Honua failed to plausibly allege antitrust injury).  Because it is

dispositive, this court addresses only antitrust standing.

## A.      Elements of Antitrust Standing

To maintain a claim for a antitrust violation, a private claimant must

have "antitrust standing."  This requirement "is distinct from Article III standing.

A plaintiff who satisfies the constitutional requirement of injury in fact is not

necessarily a proper party to bring a private antitrust action."  *Am. Ad Mgmt, Inc. v.*

*Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999) (citation omitted).

This "antitrust standing" requirement stems from § 4 of the Clayton Act, 15 U.S.C.

§ 15(a),[13] which describes who may maintain a private damages action under the

antitrust laws:

> [A]ny person who shall be injured in his business or property
> by reason of anything forbidden in the antitrust laws may sue

---

[13]  Section 16 of the Clayton Act also grants private parties the right to seek injunctive
relief for threatened loss due to violation of the antitrust laws.  *See* 15 U.S.C. § 26.  Antitrust
injury is a prerequisite for seeking private equitable relief as well.  *See Cargill, Inc. v. Montfort*
*of Colo., Inc.*, 479 U.S. 104, 112 (1986) ("It would be anomalous, we think, to read the Clayton
Act to authorize a private plaintiff to secure an injunction against a threatened injury for which
he would not be entitled to compensation if the injury actually occurred.").

> therefor in any district court of the United States in the district
> in which the defendant resides or is found or has an agent,
> without respect to the amount in controversy, and shall recover
> threefold the damages by him sustained, and the cost of suit,
> including a reasonable attorney's fee.

While potentially granting almost any individual suffering injury-in-fact the right to bring suit, "Congress did not intend § 4 to have such an expansive scope." *Am. Ad Mgmt, Inc.,* 190 F.3d at 1054 (*citing Associated Gen. Contractors,* 459 U.S. at 530–535); *Bubar v. Ampco Foods Inc.,* 752 F.2d 445, 448 (9th Cir. 1985) ("Congress did not intend to provide a private remedy for all injuries that might conceivably be traced to an antitrust violation" (citation omitted)).  Rather, to determine whether a plaintiff is the proper party to bring an antitrust claim and therefore has "antitrust standing," the court must consider the following factors:

> (1) the nature of the plaintiff's alleged injury; that is, whether it
> was the type the antitrust laws were intended to forestall;
>
> (2) the directness of the injury;
>
> (3) the speculative measure of the harm;
>
> (4) the risk of duplicative recovery; and
>
> (5) the complexity in apportioning damages.

*Am. Ad Mgmt, Inc.,* 190 F.3d at 1054; *see also Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 987 (9th Cir. 2000).

Of these factors, "the nature of the plaintiff's alleged injury [*i.e.*, "antitrust injury"] is of 'tremendous significance' in determining whether a plaintiff has antitrust standing."  *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (citation omitted); *see also Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("The most important limitation is that the private party must prove the existence of 'antitrust injury.'") (citation, emphasis, and quotation signals omitted).  Indeed, "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4."  *Am. Ad Mgmt., Inc.,* 190 F.3d at 1055 (*quoting Cargill,* 479 U.S. at 110 n.5).

Antitrust injury is not merely injury-in-fact, or even injury caused by an antitrust violation:

> A private antitrust plaintiff does not acquire standing merely by showing that it was injured in a proximate and reasonably measurable way by conduct of the defendant violating the antitrust laws (injury-in-fact).  Nor is it enough that the injury be causally connected to the acts that violate the antitrust laws (causation).

Areeda & Hovenkamp, *An Analysis of Antitrust Principles and their Application* ¶ 337a (2024).  Rather, antitrust injury "is defined . . . more restrictively as 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Glen Holly Entm't, Inc. v. Tektronix Inc.,* 343 F.3d 1000, 1007–08 (9th Cir. 2003) (*quoting Brunswick Corp. v. Pueblo*

23

*Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)).  Because antitrust injury "depends less on the plaintiff's proof than on the logic of its complaint and its theory of injury[,]" this inquiry is "well-suited to prediscovery disposition."  Areeda & Hovenkamp, *An Analysis of Antitrust Principles and their Application*, ¶ 337d (2024).

Based on *Brunswick*, the Ninth Circuit has identified the elements of antitrust injury as including: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Somers v. Apple, Inc.,* 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Am. Ad. Mgmt.,* 190 F.3d at 1055).

Regarding the third and fourth requirements of "antitrust injury," "a plaintiff must prove that his loss flows from an *anticompetitive* aspect of the defendant's behavior . . . .  If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se*."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  In other words, "[a]n antitrust plaintiff must prove that the restraint in question injures competition in the relevant market; injury to the plaintiff alone is not sufficient to prove injury to competition."  *Theee Movies of Tarzana v. Pacific Theatres, Inc.*, 828 F.2d 1395, 1400 (9th Cir. 1987);

24

*see also Brunswick Corp.*, 429 U.S. at 488 ("The antitrust laws . . . were enacted for 'the protection of competition, not competitors.'") (quoting *Brown Shoe Co. v. United States,* 370 U.S. at 320 (1962)).

A fifth requirement for antitrust injury is that "the injured party be a participant in the same market as the alleged malefactors." *Glen Holly Entm't, Inc.,* 343 F.3d at 1008 (citation and quotation marks omitted). Generally, consumers and competitors are the most likely to suffer antitrust injury, but other market participants can suffer antitrust injury as well. *Am. Ad. Mgmt.*, 190 F.3d at 1057; *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982) (holding that non-competitor plaintiff had alleged antitrust injury where the injury she suffered was "inextricably intertwined" with the injury to the market); *see also Ostrofe v. H.S. Crocker Co., Inc.,* 740 F.2d 739, 745–46 (9th Cir. 1984) (holding that though plaintiff was not a consumer or a competitor, the fact that injury to plaintiff was necessary to achieve the conspirators' illegal aims was sufficient to establish antitrust injury). "[I]t is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Am. Ad. Mgmt.*, 190 F.3d at 1058.

**B.      The April 2, 2024 Order Correctly Determined that Amendment Would Be Futile**

When it considered Hu Honua's antitrust standing in *Hu Honua I* and *Hu Honua II*, this court concluded that Hu Honua did not allege antitrust injury in its FAC or SAC because—among other reasons—the alleged injury "was both speculative and controlled by the PUC." *Hu Honua II*, 2018 WL 5891743, at *5 (summarizing *Hu Honua I*).  Similar to the claims in the FAC and SAC, the proposed TAC's new and retailored claims lack antitrust standing.  The link between Defendants' conduct and Hu Honua's alleged injury—that is, the relationship between the Defendants' acquisition of the Hamakua plant and Hu Honua's exclusion from the market—is speculative.  Given the unique non-conclusory facts before the court as alleged in the proposed TAC, Plaintiff's claim of antitrust injury fails to cross the line from conceivable to plausible.  *Nielsen*, 101 F.4th at 1169.

**1.      Hu Honua's Alleged Antitrust Injuries**

Hu Honua defines its antitrust injury as "HECO's anticompetitive, exclusionary, monopolistic, and monopsonistic course of conduct," which "has caused substantial injury to competition in the relevant wholesale market."  ECF No. 216-3 at PageID.6059.  The injuries to competition it alleges are summarized as follows:

(1) HECO has expanded and strengthened its monopoly;

(2) HECO has excluded actual and potential competitors from the actual market, including Hu Honua;

(3) HECO has eliminated its largest independent competitor by acquiring the Hamakua plant;

(4) only one independent power producer remains in the relevant market, and independent competition and all its benefits have been virtually or entirely extinguished in the market;

(5) HECO's conduct has reinforced and raised barriers to entry in the relevant market;

(6) the facilities and plants serving the relevant market have become increasingly outdated, and of diminished quality and reliability;

(7) output in the relevant market has been restrained and reduced;

(8) the cost of generating wholesale firm power has increased in the relevant market; and

(9) HECO's anticompetitive conduct has caused harm to consumers and businesses in the retail electricity market (different from the market of wholesale generation and sale of firm energy).

*See id*. at PageID.6059–6063.

Because Hu Honua's new Clayton and revised Sherman Act claims focus on the Hamakua acquisition, this court first examines whether the harms alleged by Hu Honua plausibly flow from Defendants' acquisition of the Hamakua plant.

### 2.      *Hu Honua's Allegations of Antitrust Injury Are Not Plausible*

The elements of antitrust injury include: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Somers,* 729 F.3d at 963 (quoting *Am. Ad. Mgmt.,* 190 F.3d at 1055). The April 2, 2024 Order appears to have concluded that the third factor was absent—essentially, that Hu Honua had not alleged an injury flowing from the anticompetitive effects of the Hamakua acquisition. *See* ECF No. 243 at PageID.6746. Because the April 2, 2024 Order recognized that causation was absent, it did not address whether the conduct at issue was unlawful or anticompetitive. Like the April 2, 2024 Order, this court assumes the unlawfulness of the Hamakua acquisition, and begins (and ends) with antitrust injury—an examination of whether Hu Honua has alleged an injury flowing from the purported anticompetitive effects of the acquisition.

Of Hu Honua's allegations of antitrust injury, only one describes a direct impact to Hu Honua: that "HECO has excluded actual and potential competitors from the actual market, including Hu Honua." ECF No. 216-3 at PageID.6060. All of the other allegations describe harms to competition, but these implicate Hu Honua only indirectly, to the extent that they reinforce Hu Honua's key harm (its exclusion from the market). To establish antitrust injury, Hu Honua must allege that this injury to itself (exclusion) was caused by Defendants' anticompetitive actions that also caused harm to a relevant market.

HELCO is the only utility the PUC has authorized to buy power on Hawaii Island, giving HELCO a de facto—and statutorily authorized— monopsony. *See* HRS § 269-7.5(a) ("No public utility . . . shall commence its business without first having obtained from the commission a certificate of public convenience and necessity."); ECF No. 216-3 at PageID.6021. And before Hu Honua could become operational and sell power to HELCO for distribution downstream, at least two things must happen: (1) HELCO and Hu Honua must enter into yet another PPA; and (2) the PUC must approve that PPA. *See* HRS § 269-27.2(c) ("The rate payable to the public utility to the producer for the nonfossil fuel generated electricity . . . shall be as agreed between the public utility

29

and the supplier and as approved by the public utilities commission . . . .").[14]

Given this background, the court determines that Hu Honua's proposed TAC fails to plausibly allege that its injury (foreclosure from the market) "flows from" Defendants' acquisition of the Hamakua plant. *Somers*, 729 F.3d at 963. Instead, the injury "flows from" PUC regulation and the ultimate PUC and Hawaii Supreme Court rejection of the Amended PPA.

The timeline of events places the court's analysis in proper context. The Amended PPA, which the PUC approved in July 2017, was appealed on procedural grounds; then, in November 2017, a few months later, HEI acquired the Hamakua plant. ECF No. 216-3 at PageID.6052. At that time—*after* the Hamakua acquisition took place—Hu Honua had suffered no injury based on foreclosure from the market; it assumed that it would eventually operate under the Amended PPA.[15] Hu Honua admits in its briefing that at the time of the Hamakua acquisition, it faced "no imminent or nonspeculative threat of foreclosure from the

---

[14] Counsel for Hu Honua admitted during the July 30, 2024 hearing that in order for Hu Honua to operate going forward, it would need to enter into a new PPA with HELCO, and then have that PPA approved by the PUC.

[15] For example, in a July 2, 2018 status report to the court (after the Amended PPA was approved by the PUC but pending further state court litigation, and after the acquisition of the Hamakua plant), Hu Honua stated that Hu Honua and Defendants "remain firmly committed to ensuring [the Amended PPA] secures final, non-appealable [PUC] approval," that its "confidence in [PUC approval] is manifest in its expenditure of tens of millions of dollars" to complete construction of its plant, and that Hu Honua and Defendants continue "to defend the PUC's Order approving" the Amended PPA in state court. ECF No. 169.

acquisition."  ECF No. 244 at PageID.6774.  Instead, per Hu Honua, the harm of foreclosure only became "concrete" when the Hawaii Supreme Court affirmed the PUC's rejection of the Amended PPA in 2023.  *Id.* at PageID.6774–6775.  This timeline tells a story:  Hu Honua's injury stems from denial of the Amended PPA, not from the Hamakua acquisition—if the PUC (and the Hawaii Supreme Court) had ultimately approved the Amended PPA, Hu Honua would be in the market, and there would be no injury.  And if the Hamakua acquisition had not occurred, and the Amended PPA had been denied, Hu Honua would have suffered the same "foreclosure" injury.

In an apparent effort to bolster a showing of antitrust injury, the proposed TAC includes allegations that—although HECO, HELCO, and Hu Honua were on the same side in the PUC and Hawaii Supreme Court proceedings—"HECO took steps to frustrate Hu Honua's success," and undertook "efforts to frustrate approval" by the PUC.  ECF No. 216-3 at PageID.6055–6064.  These allegations are either conclusory or lack plausibility.

For example, the allegation that "HECO's efforts to frustrate approval ultimately succeeded and the PUC rejected the amended PPA and, in March 2023, the Hawaii Supreme Court affirmed that rejection, thereby rendering the settlement agreement null and void and of no further effect," *id.* at PageID.6056, is purely

conclusory.  The proposed TAC alleges no specific facts explaining how HECO "frustrate[d]" approval by the PUC.  *Id.*  Instead, to the extent non-conclusory facts are alleged, Plaintiff appears to ask the court to assume—with no support—that HECO provided incorrect or misleading information in an effort to undermine the PUC approval (as opposed to providing information that, at the time, was accurate, but that the PUC ultimately determined was unhelpful).  Stated differently, there is nothing to suggest that the information provided by HECO was in any way materially inaccurate.  HECO obviously engaged in the PUC process and provided information, some of which may not have been helpful to ultimate approval.  But providing truthful information that ultimately proved unhelpful is a long way from undertaking efforts to "frustrate approval."[16]  Further, as the Hawaii Supreme Court recognized, at the PUC hearings "Hu Honua *and* HELCO maintained that the Amended PPA served the public interest.  Yet *they* admitted that by their own numbers, the proposed project would produce massive carbon emissions—

---

[16]  As an example, Hu Honua apparently took the position before the PUC that its plant would only displace fossil fuel, not renewable resources.  *HELCO III,* 152 Haw. at 356, 526 P.3d at 333.  HELCO (and the Consumer Advocate, a statutorily-mandated party to the proceedings) stated otherwise—that "it would be 'impossible' for the project to avoid displacing other renewable resources."  *Id*.  In fact, the Consumer Advocate estimated that almost 60% of Hu Honua's generation would replace renewable resources.  *Id*.  Now, Hu Honua claims that HELCO's position before the PUC "underscored its favoritism toward its own fossil fuel plants and its monopsony control over energy dispatch."  ECF No. 216-3 at PageID.6057.  But there is absolutely nothing to suggest that HELCO (and the Consumer Advocate) were making false predictions at that time in order to undermine PUC approval.

8,035,804 metric tons over its 30-year term." *HELCO III*, 152 Haw. at 355, 526 P.3d at 332 (emphasis added).

Finally, a reading of *HELCO III* itself demonstrates that the Amended PPA was rejected not because of Defendants, but because Hu Honua—in conjunction with HELCO—provided unsatisfactory figures as to carbon emissions. *Id.* In fact, HELCO provided a carbon output analysis that it labelled as independent, but the Supreme Court found "in fact relied on Hu Honua's" analysis. *Id*. In other words, even if the proposed TAC plausibly alleges that HELCO attempted to undermine the PUC's approval of the Amended PPA (which it does not), it fails to plausibly allege—particularly given the Supreme Court's findings in *HELCO III*—that the PUC and subsequent Supreme Court denial of the Amended PPA was because of any action taken by Defendants. The Amended PPA fell under its own weight, not because of Defendants.

Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Hu Honua has alleged that the Hamakua acquisition is *related to* its harm: foreclosure from the market. But judicial experience and common sense lead to a different conclusion—Hu Honua's ultimate foreclosure from the market is because of the PUC and the Hawaii Supreme Court's rejection of the Amended

PPA, and not because of Defendants' alleged anticompetitive conduct.  It is because of the PUC and Hawaii Supreme Court's rejection of the Amended PPA that Hu Honua is unable to sell power.  The nexus between the Hamakua acquisition and Hu Honua's foreclosure from the market is simply too speculative—Hu Honua's injury does not plausibly "flow[] from" the acquisition. *Somers*, 729 F.3d at 963.

"That a regulatory or legislative bar can break the chain of causation in an antitrust case is beyond fair dispute." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 165 (3d Cir. 2017).  As stated by a leading antitrust treatise:

> The plaintiff's need for a license or other authorization from the government that it does not yet actually have impairs both the claim that it would have entered and its claim that it was the defendant's conduct that prevented such entry.
>
> * * *
>
> If such a license [required by a regulatory body] were not forthcoming, the government rather than the defendant would be a sufficient and independent cause of the plaintiff's loss.  On the other hand, the defendant's illegal conduct may itself be a sufficient cause of the plaintiff's non-entry.  In general, the absence of a license should not block recovery when the plaintiff can show that it very likely would have received a license.

Areeda & Hovenkamp, *An Analysis of Antitrust Principles and their Application*, ¶ 349b (2024); *see also RSA Media, Inc. v. AK Media Group, Inc*., 260 F.3d 10, 15 (1st Cir. 2001) (finding that the plaintiff was not excluded from the market by the defendant, but because of "the Massachusetts regulatory scheme that prevents new billboards from being built"); *In re Canadian Imp. Antitrust Litig*., 470 F.3d 785, 791 (8th Cir. 2006) (finding the absence of competition from Canadian sources in the United States prescription drug market was caused by a federal statutory and regulatory scheme, not the conduct of the defendants); *Bourns, Inc. v. Raychem Corp*., 331 F.3d 704, 711 (9th Cir. 2003) ("Only an actual competitor or one ready to be a competitor can suffer antitrust injury.").

Here, Hu Honua failed in its efforts to obtain approval of the Amended PPA by regulatory authorities. And Hu Honua has not shown in the proposed TAC that there is any likelihood of future approval. To suggest otherwise is simply not supported by any facts, but instead is mere speculation (or perhaps, hope). In short, Hu Honua fails to nudge the proposed TAC's non-conclusory allegations from conceivable to plausible.

This is not to say that the State's regulatory regime displaces antitrust remedies—it does not. *See Hu Honua I*, 2018 WL 491780, at *12 ("The court is not suggesting that PUC involvement *necessarily* immunizes any of the

Defendants from antitrust laws . . . .").  Rather, specific to this case and the

proposed TAC, the particular injury to competition Hu Honua has alleged flows

from the effects of regulations and regulators' intervention, not the Hamakua

acquisition.

### 3.   *PURPA Further Complicates the Purported Link Between Defendants' Actions and Hu Honua's Harms*

Hu Honua has refocused its Sherman and Clayton Act claims on the

Hamakua acquisition, but to the extent any of Hu Honua's antitrust allegations are

predicated on the termination of its PPA, the court's prior rulings apply.  And that

reasoning bears repeating here.  Hu Honua's biomass power plant was a qualifying

facility under PURPA when the PPA was negotiated.  ECF No. 138 at

PageID.2433–2434.  *Hu Honua I*, 2018 WL 491780 at *9–*10 (citing *Greensboro*,

643 F.Supp. at 1371).  The court explained that a qualifying facility whose

relationship to the power production market was structured by PURPA largely

does not compete in that market:

> Effectively . . . Hu Honua does not (or would not)
> "compete" in the power production market with its qualifying
> facility, and thus competition could not be harmed by
> termination of its PPA (even if the FAC otherwise states a
> claim for breach of contract against HELCO).  As *Greensboro
> Lumber Co.* explained
>
> > In establishing PURPA . . . Congress did not intend to
> > place qualifying facilities in competition with public

36

utilities. To the contrary, Congress has sought to encourage the development of qualifying facilities by insulating them from competition. Qualifying facilities are not authorized under PURPA to sell at retail.

643 F. Supp. at 1373 (citation omitted); *see also Schuylkill Energy Res.*, 113 F.3d at 415 (finding no antitrust injury for PURPA power-producer, primarily because "state and federal laws prohibit [plaintiff] from competing in the relevant market"); *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1194, 1207 (W.D.N.Y. 1995) (finding no likelihood of an antitrust injury at a preliminary injunction stage, reasoning in part that "[t]he PPA, which [PURPA-producer] Kamine is attempting to enforce, was not created as a result of market forces or a competitive process; it is a creature of a statutory scheme [(PURPA)] set up for reasons that have nothing to do with competition *per se*"); *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 969 F. Supp. 907, 915 (D.N.J. 1997) (finding no antitrust injury in action brought by PURPA-producer, reasoning that "Defendant's actions may have caused injury to plaintiff, but they did not cause injury to competition in a defined market [and was] not the sort of injury the antitrust laws were meant to prevent"), *rev'd on other grounds*, 159 F.3d 129 (3d Cir. 1998). "PURPA was created as a vehicle to reduce the nation's dependency on foreign oil and to conserve energy, not to foster competition." *Kamine/Besicorp Allegany L.P.*, 908 F. Supp. at 1204.

*Hu Honua I*, 2018 WL 491780, at *10.

After the court dismissed the antitrust claims in the FAC, Hu Honua added "several paragraphs of allegations regarding [qualifying facilities] under PURPA, claiming that Hu Honua actually 'competed' in the wholesale market for firm power." *Hu Honua II*, 2018 WL 5891743 at *6. Hu Honua argued that its

PPA was negotiated freely and was not presented to the PUC as a PURPA avoided-cost contract, and Hu Honua therefore acted as a competitor in the wholesale power market. *Id.*

Those amendments were unavailing. In *Hu Honua II,* the court held that even if Hu Honua did not present the PPA as a PURPA contract, Hu Honua's status as a qualifying facility meant that its negotiations with Defendants were conducted under the auspices of PURPA. *Id.* at *7 ("The PPA was thus negotiated in light of a guaranteed market with PURPA's "'mandatory buy' and 'avoided cost' provisions as benchmarks, and brings with it all of PURPA's rights and remedies as part of the picture."); *see also SPower Dev. Co., LLC v. Colo. Pub. Utils. Comm'n*, 2018 WL 1014142, at *7 (D. Colo. Feb. 22, 2018) ("'[A] [qualifying facility] has the unconditional right' to choose to sell its output to an electric utility and, in exercising that right, may contract with the utility or force the utility to accept its output through a legally enforceable obligation approved by state authorities.").

In its Objections, Hu Honua does not offer any additional authority or facts that would prompt reconsideration of these rulings. It attempts to distinguish *Hu Honua I* and *Hu Honua II* from the instant challenge to the proposed TAC on the basis that the prior rulings spoke only to the retail market for power (i.e. energy

provided to consumers who pay HELCO for electricity) and did not apply to the

wholesale market for power (i.e. energy provided to HELCO), upon which its

claims are now focused.  ECF No. 244 at PageID.6757.  Hu Honua is mistaken—

the court made it clear that Hu Honua had not adequately alleged antitrust injury

from the termination of its PPA in the retail market *or* in the wholesale market.  In

fact, Hu Honua made this same argument back then, and the court addressed it.

The reasoning still applies:

> Hu Honua [argues] that it is not claiming harm to
> competition in the *retail* market . . . but rather harm to
> competition in the wholesale market . . . .  But Hu Honua is
> largely not a competitor with HELCO in that market either—
> Hu Honua would have been HELCO's *supplier*, with HELCO
> in turn providing electricity to retail rate-paying consumers.
> *See Schuylkill Energy Res.*, 113 F.3d at 415 (rejecting argument
> that defendant's policy of favoring its owned-power producers
> over an independent producer could harm competition because
> "[plaintiff] is not [defendant's] *competitor*—it is [defendant's]
> *supplier*").

> The court also recognizes that HELCO is also a supplier
> to itself (through HELCO-owned power plants).  But it is
> difficult to find plausible harm to competition from Hu Honua
> in that limited "market," . . . .  Indeed, the cases cited
> previously also found no antitrust injury where independent
> power producers also claimed harm in wholesale markets.
> *Greensboro Lumber Co.* reasoned that,

> > [I]n the wholesale market, PURPA establishes a
> > guaranteed price which is equal to, or greater than, the
> > price that would be received in a competitive market.  In
> > addition to providing a guaranteed price to qualifying

> facilities, PURPA also provides a guaranteed market for
> the power generated by qualifying facilities by making it
> a requirement that utilities purchase available energy and
> capacity from qualifying facilities before buying power
> from anywhere else; *no amount of price cutting or other*
> *competition can change this result.*
>
> 643 F. Supp. at 1373 (emphasis added).  "In general, qualifying
> facilities produce a component which is used by public utilities
> and consume utility service; but, they are not competitors of
> public utilities." *Id.*; *see also Schuylkill Energy Res.*, 113 F.3d
> at 416-17; *Kamine/Besicorp Allegany*, 908 F. Supp. at 1203-05.
> *But cf. Long Lake Energy Corp. v. Niagara Mohawk Power*
> *Corp.*, 700 F. Supp. 186, 188 (S.D.N.Y. 1988).

*Hu Honua I*, 2018 WL 491780, at *11.

Hu Honua has removed any reference to PURPA from its proposed

TAC, but as a qualifying facility, Hu Honua's Amended PPA was nonetheless

negotiated under the auspices of PURPA.  Hu Honua cannot hide that fact by not

mentioning it.  And although PURPA is not a categorical bar on antitrust recovery

for qualifying facilities,[17] it means Hu Honua was largely not a competitor in the

wholesale market, which further attenuates the purported link between Defendants'

actions and Hu Honua's harm.  Hu Honua does not address the court's prior

rulings, and in the proposed TAC, it assumes without explanation that Hu Honua is

an "actual or potential competitor (and supplier) of HECO."  ECF No. 216-3 at

---

[17]   *See* 16 U.S.C. § 2603(1) ("Nothing in this Act or in any amendment made by this Act
affects—(1) the applicability of the antitrust laws to any electric utility. . . .").

PageID.6067.  Thus, Hu Honua has not given the court any reason to reconsider its prior holding that, because it is a qualifying facility under PURPA whose participation in the market is mediated (and ability to sell power guaranteed) by statute, Hu Honua is largely not a competitor of HELCO in the wholesale market for firm power, and therefore its allegations of antitrust injury from the Hamakua acquisition are speculative.

### 4.    Hu Honua's Injury Arises out of a Breach of Contract

Ultimately, the court sees no reason to reconsider its determination in *Hu Honua I* and *Hu Honua II* that

> this is little if anything more than a breach of contract action between Hu Honua and HELCO.  The fundamental dispute revolves around HELCO's alleged breach of the Hu Honua PPA by unreasonably withholding milestone-date extensions, or otherwise wrongfully terminating that contract.  FAC ¶¶ 60, 65, 110-11, 168-71.  "As the First Circuit has observed, '[s]ome antitrust cases are intrinsically hopeless because . . . they merely dress up in antitrust garb what is, at best, a business tort or contract violation.'"  *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1087 (11th Cir. 2016) (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 69 (1st Cir. 2004)).

*Hu Honua I,* 2018 WL 491780, at *12.  And,

> [l]ike *Schuylkill Energy Resources*, "[t]he fundamental dispute between [Hu Honua] and [HELCO] concerns the interpretation of the Power Purchase Agreement . . . and should be resolved pursuant to common-law contract principles," not through the antitrust laws. 113 F.3d at 418.  Like *Kamine/Besicorp*

41

> *Allegany L.P.*, "whether [HELCO] has breached the PPA or
> not, [Hu Honua] has not sufficiently demonstrated an *antitrust*
> injury[.]"  908 F. Supp. at 1208.  And like *Crossroads*
> *Cogeneration* "[HELCO's] actions may have caused injury to
> plaintiff, but they did not cause injury to competition in a
> defined market.  This is not the sort of injury the antitrust laws
> were meant to prevent."  969 F. Supp. at 915.

*Hu Honua II*, 2018 WL 5891743, at *10 (quoting *Hu Honua I,* 2018 WL 491780,

at *12).

## C.  Hu Honua's Arguments to the Contrary Are Unpersuasive

The court turns to Hu Honua's remaining arguments.

### 1.  *The April 2, 2024 Order's Determination Is Tailored to the Facts of This Case and Does Not Categorically Preclude Antitrust Recovery in This Market*

In support of its Objections, Hu Honua complains that the April 2,

2024 Order, in holding that there is no antitrust injury, has "devise[d] a novel and

dangerous regulatory defense that shields monopolists like HECO from antitrust

scrutiny as a matter of law."  ECF No. 249 at PageID.7165.  Hu Honua argues that,

in finding there was no antitrust injury here, the April 2, 2024 Order essentially

held that regulation forms a "categorical legal bar" on antitrust enforcement in the

Big Island market for wholesale power, which has effectively made "the courts []

unavailable to Hu Honua."  ECF No. 244 at PageID.6767.  This, according to Hu

Honua, contravenes the regulations at issue—which explicitly disclaim any

displacement of antitrust remedies[18]—and Ninth Circuit case law.  Hu Honua's

argument relies largely on *Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 664 F.2d 716

(9th Cir. 1981), and *Ellis v. Salt River Project Agricultural Improvement and*

*Power District*, 24 F.4th 1262 (9th Cir. 2022).

   But neither authority supports Hu Honua's theory of a "categorical

legal bar."  ECF No. 244 at PageID.6767.  Antitrust injury was not at issue in

*Phonetele*—that case discusses the doctrine of antitrust immunity, and speaks

primarily to liability, rather than standing.  The antitrust immunity doctrine

concerns "whether Congress intended to repeal the antitrust laws with respect to

[a] particular industry when it enacted [a] regulatory scheme."  *Northrop Corp. v.*

*McDonnell Douglas Corp.*, 705 F.2d 1030, 1056 (9th Cir. 1983) (*citing Phonetele*,

664 F.2d at 726).

   Relying on *Phonetele*'s holding that "'regulation in an antitrust case *in*

*other than an immunity context*' raises factual issues that cannot be resolved at the

pleadings stage," Hu Honua argues that here, where the April 2, 2024 Order did

not find regulatory immunity, Hu Honua's claims should not be dismissed.

---

[18]  Hu Honua points out that the Affiliate Transaction Requirements that the PUC
established after the Hamakua acquisition state that they do not displace the antitrust laws.  ECF
No. 244 at PageID.6766 (citing ECF No. 226-4 at PageID.6461 ("Nothing in these Requirements
shall confer immunity from State or federal antitrust laws)).  And, PURPA explicitly does not
supplant the antitrust laws.  *Id.* at PageID.6771 ("Nothing in this Act . . . affects . . . the
applicability of the antitrust laws to any electric utility.") (quoting 16 U.S.C. § 2603(1)).

*Phonetele*, 664 F.2d at 742 (internal quotations omitted and emphasis added); ECF No. 244 at PageID.6767.  But the question here is not whether regulation makes Defendants immune from antitrust liability—it is whether the proposed TAC plausibly alleges that Defendants caused an antitrust injury.  The April 2, 2024 Order determined that Hu Honua's claim that its lack of PPA was caused by the Hamakua acquisition was speculative.  Regulation is an important ingredient in this determination, because PPAs must be approved by the PUC, and Defendants hold a PUC-authorized monopsony, both of which complicate the alleged nexus between Defendants' actions and Hu Honua's harm.  But regulatory *immunity* is not at issue.  Thus, *Phonetele* provides Hu Honua no help.

Hu Honua appears to push this argument even further.  During the July 30, 2024 oral argument, counsel for Hu Honua argued that under *Phonetele*, if antitrust immunity is lacking, then there are necessarily factual issues for trial.  And in its Reply, Hu Honua states that *Phonetele* holds that "'regulation in an antitrust case in other than an immunity context' raises *factual issues to be resolved at a later stage*").  ECF No. 249 at PageID.7171 (emphasis altered).  This argument is odd—if there is no antitrust immunity, the court simply applies the *Twombly* plausibility standard, regardless of whether the market is regulated.  *Phonetele* does not carve out a special *Twombly* exemption for antitrust cases that

44

are not barred by immunity, but nonetheless involve a regulated market.  In fact, taking Hu Honua's position to the extreme, the court could grant a motion to dismiss in an antitrust case that involves no regulation, but could not do so in a case that *does* involve regulation.  That would be absurd.

Next, Hu Honua cites *Ellis*, claiming that where, "as here," a state "expresses a general policy favoring competition," a utility defendant may not invoke state regulatory immunity to antitrust claims.  *Ellis*, 24 F.4th at 1277; ECF No. 244 at PageID.6767.  Leaving aside Hu Honua's claim that Hawaii has a "general policy favoring competition,"[19] this holding is part of *Ellis*'s discussion of

---

[19]  Although the court acknowledges that the PUC adopted a "Framework for Competitive Bidding" to govern acquisition of "a future generation resource or block of generation resources," the court's review of the PUC's governing statutes has not revealed any overriding policy directive to foster a competitive market analogous to Arizona's in *Ellis*.  *See Matter of Maui Elec. Co., Ltd.*, 150 Haw. 528, 535, 506 P.3d 192, 199 (2022).  For example, in Hawaii, the PUC is empowered to set a just and reasonable rate for non-fossil fuel generated power, HRS § 269-27.2(c), whereas the Arizona statute at issue in *Ellis* declares that "the most effective manner of establishing just and reasonable rates for electricity is to permit electric generation service prices to be established in a competitive market."  *Ellis*, 24 F.4th at 1276 (quoting Ariz. Rev. Stat. Ann § 40-202(D)).

In fact, the very case that Hu Honua relies on to argue that the Hawaii market is designed to be competitive states that for the PUC, protecting the public interest is paramount.  *See Maui Elec. Co.*, 150 Haw. at 534, 506 P.3d at 198 ("The PUC must always act in the public interest. This principle is incorporated throughout HRS chapter 269.") (citing HRS § 269-16.22 (disallowing a utility's recovery of power purchase costs if the PUC finds them to have been incurred "in bad faith" or "in violation of law"); HRS § 269-27.2(c) (providing the PUC authority to determine as appropriate "the just and reasonable rate" for non-fossil fuel-generated electricity supplied to a utility company); and HRS § 269-145.5(b) ("In advancing the public interest, the commission shall balance technical, economic, environmental, and cultural considerations associated with modernization of the electric grid . . . .")); *see also HELCO III*, 152 Haw. at 357, 526 P.3d at 334 ("[T]he PUC has a duty to act in the public interest. . . .

(continued . . .)

state-action immunity, which—similar to the antitrust immunity doctrine discussed above—was not a basis for the Magistrate Judge's ruling.[20]  *Ellis* first asked whether the plaintiffs had established the elements of antitrust injury, *then* turned to whether the doctrine of state action immunity applied—a clear indication that these are two separate inquiries.  Thus, the April 2, 2024 Order correctly applied the *Ellis* discussion of antitrust injury.

In sum, neither the April 2, 2024 Order nor this Order creates a "novel regulatory defense" or makes a categorical statement that antitrust remedies are not available in the Big Island market for electric power.  Instead, "the structure of a regulated industry *may* create a lack of antitrust standing"—and in this case, it did.  *Hu Honua I*, 2018 WL 491780, at *12 (citing *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 269 (3rd Cir. 1998)) (emphasis added).

### 2.  The Current Outages on the Big Island and Hu Honua's Current Lack of Contract Do Not Establish that Hu Honua Suffered an Antitrust Injury from the Hamakua Acquisition

Many of Hu Honua's revisions to the SAC focus on outages and blackouts on Hawaii Island, as evidence of an injury to "the people of Hawaii

---

Protecting rate-payers by considering pricing impacts follows from that public interest obligation.").

[20]  Having determined that the proposed TAC fails to allege a plausible antitrust injury, this court likewise does not address state action immunity.

Island and HECO's actual and potential competitors alike."  ECF No. 216-4 at

PageID.6098.  Hu Honua also argues that this cannot be a mere breach of contract

case—i.e., it must have a viable antitrust claim—because Hu Honua "is being

foreclosed now when it has no contract."  ECF No. 244 at PageID.6764.  But as

explained above, claiming that the PPA's termination in 2016, the Hamakua

acquisition, the power shortages on the Big Island in early 2024, and Hu Honua's

present lack of contract are caused by the same harm (and should be part of the

same lawsuit) stretches plausibility.

        Hu Honua also argues that the April 2, 2024 Order erred in attributing

Hu Honua's inability to sell power to PUC regulation, insisting that its "inability to

sell *is the antitrust injury*" that flows from the alleged antitrust violation.  ECF No.

244 at PageID.6763–6764 (citing *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32

F.4th 824, 840 (9th Cir. 2022) (holding that Defendant realtors' association's

policy "prevented PLS from gaining a foothold in the market")).  But *PLS.Com*

illustrates Hu Honua's error.  PLS.Com was an internet-based service for "pocket

listings," or real estate listings for sellers who did not want their properties to

appear on a multiple listing service, or MLS (for example, a public figure may not

want to put pictures of their home on an MLS for privacy reasons).  *PLS.Com*, 32

F.4th at 830.  Defendant realtors' association enacted a policy that required any

realtor who used PLS to also list their properties on an MLS, or face severe penalties—a policy that Defendants admitted was enacted "specifically to exclude PLS." *Id.* at 831.

Here—unlike in *PLS.Com*—there is no admitted anticompetitive policy. There is only Hu Honua's conclusory—and, ultimately, implausible— allegation that its current foreclosure from the market is Defendants' fault, which is complicated by the PUC and the Hawaii Supreme Court's intervention. As explained, Hu Honua has alleged that it suffered an injury, but the link between that injury and the purported anticompetitive effects of Defendants' conduct is too attenuated to satisfy the antitrust injury requirement.

### 3.     *Hu Honua's Request for Judicial Notice Is Granted, but Does Not Impact the Result*

A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). On de novo review of a Magistrate Judge's determination, the court has discretion to take judicial notice of evidence presented for the first time in a party's objection. *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000). A court "may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Khoja v. Orexigen Therapeutics, Inc.*, 899

F.3d 988, 999 (9th Cir. 2018).  But a court "cannot take judicial notice of disputed

facts contained in such public records."  *Id.*

Hu Honua has submitted a Request for Judicial Notice attaching

several items:  an online news article detailing blackouts on Hawaii Island, a

number of online news releases by HECO describing outages and delayed

retirement of fossil fuel plants, an informational webpage regarding the current

status of the Hamakua plant, filings in PUC proceedings, a PUC order, and a

Revised [proposed] Third Amended Complaint that incorporates further allegations

post-dating the proposed TAC, describing how HECO recently awarded a PPA to

the Hamakua plant over Hu Honua.  ECF Nos. 246 (motion), 246-1 through 246-

10 (documents for judicial notice).

The court takes judicial notice of the fact, date and contents of the

PUC filings and order (though not the allegations therein).  *See United States v.*

*Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("Courts may take judicial notice of . . .

the 'records and reports of administrative bodies.'") (quoting *Interstate Nat. Gas*

*Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)).  Likewise, it takes

judicial notice of the various web pages' existence, but not the facts contained

therein.  *See In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1024 (N.D. Cal. 2014)

("publicly accessible websites" may be judicially noticed).  Having granted judicial

49

notice of the existence of these documents, however, the court's position is unchanged. As explained, Hu Honua's attempt to draw a causal line from the Hamakua acquisition to its present-day lack of contract is unavailing—for the reasons explained above, the causal link between an acquisition consummated in late 2017 and Hu Honua's current situation is simply too attenuated to be anything but speculative.

Hu Honua's request that the court take judicial notice of their Revised Proposed TAC is denied. The Revised Proposed TAC is not a fact that may be judicially noticed. If Hu Honua wanted leave to file the Revised Proposed TAC rather than the proposed TAC, it should have withdrawn its initial motion for leave to amend and then moved again for leave to file the revised version.

### 4. *Joinder and Further Leave to Amend Antitrust Claims Are Denied*

The April 2, 2024 Order correctly held that in order to add new defendants, a plaintiff must satisfy the amendment standard of Rule 15 and the permissive joinder standard of Rule 20(a). *See Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1374 (9th Cir. 1980). As explained above, Hu Honua has not stated plausible antitrust claims and has therefore not satisfied Rule 15. Moreover, Rule 20(a) requires that a right to relief asserted against Defendants arise "out of the same transaction, occurrence, or series of transactions or

occurrences."  Concluding that Hu Honua has not alleged antitrust injury flowing

from an anticompetitive scheme involving the Hamakua acquisition, the court

denies leave to join subsidiaries Pacific Current, Hamakua Holdings, and Hamakua

Energy, whose only connection to the claims is participation in the Hamakua

acquisition.

The court has reviewed the Revised Proposed TAC, ECF No. 246-10,

and it does not cure the deficiency in antitrust standing identified above.  The

Revised Proposed TAC adds allegations that Hu Honua used the Hamakua facility

to foreclose Hu Honua from obtaining a new PPA in December 2023.  *Id.* at

PageID.7084–7094.  But alleging that Defendants have anticompetitively used the

Hamakua facility to deny Hu Honua a PPA in 2023 does not retroactively create a

nexus between the Hamakua acquisition in 2017 and Hu Honua's foreclosure from

the market today.  Again—but for the PUC and the Hawaii Supreme Court's denial

of the Amended PPA, Hu Honua would not have been "foreclosed."  And to the

extent that Defendants' award of a PPA to the Hamakua facility rather than Hu

Honua constitutes a "new (and anticompetitive) use of the acquired Hamakua

business," resulting in Hu Honua's foreclosure, this "new usage" is not sufficiently

related to the transaction or occurrence at issue in *this* action—the loss of Hu

51

Honua's PPA in 2016—to be part of the same lawsuit.  ECF No. 246-10 at PageID.7107.

This court has now reviewed four versions of Hu Honua's Complaint. Hu Honua is represented by experienced antitrust practitioners from prominent law firms and has had numerous bites at this apple.  Based on de novo review, and determining that amendment of the federal and state antitrust claims would be futile, the court AFFIRMS the Magistrate Judge's April 2, 2024 Order and DENIES further leave to amend the antitrust claims.  As the April 2, 2024 Order held, Hu Honua may file a Third Amended Complaint with the proposed amendments that were not contested.

## V.  <u>CONCLUSION</u>

The Magistrate Judge's April 2, 2024 Order is AFFIRMED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 12, 2024.



       /s/ J. Michael Seabright
       J. Michael Seabright
       United States District Judge

*Hu Honua Bioenergy, LLC v. Hawaiian Electric Industries, Inc., et al.*, Civ. No. 16-00634 JMS-KJM, Order (1) Affirming Magistrate Judge's Order Granting in Part and Denying in Part Plaintiff Hu Honua Bioenergy, LLC's Motion for Leave to File Third Amended and Supplemental Complaint and for Permissive Joinder, ECF No. 243, and (2) Denying Further Leave to Amend Antitrust Claims